Mark L. Shurtleff (California State Bar #140463)
mark@shurtlefflawfirm.com
Shurtleff Law Firm
3135 South 1300 East
Salt Lake City, Utah 84106
(801) 441-9625

Attorneys for Plaintiffs

_____

## IN THE UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA: WESTERN DIVISION

_____

| | |
|---|---|
| Pacific Coast Auto Body, Inc.; D & M Auto Body, Inc.; & Campbell's Auto Body; & Amato's Auto Body, Inc.; | COMPLAINT |
| | **JURY TRIAL DEMANDED** |
| Plaintiffs, | |
| | Case No. |
| vs. | |
| | |
| State Farm Mutual Automobile Insurance Company, Interinsurance Exchange of the Automobile Club, Allstate Indemnity Company, Mercury Insurance Company, CSAA Insurance Exchange, Farmers Insurance Exchange, Mid-Century Insurance Company, GEICO General Insurance Company, Infinity Insurance Company, 21st Century Insurance Company, California Automobile Insurance Company, USAA Casualty Insurance Company, Safeco Insurance Company of America, Liberty Mutual Fire Insurance Company, United Services Automobile Association, Alliance | |

United Insurance Company, Wawanesa )
General Insurance Company, Coast )
National Insurance Company, United )
Financial Casualty Company & )
Progressive West Insurance Company; )
American Family Home Insurance )
Company; & Amica Mutual Insurance )
Company; )
                   )
                   )
        Defendants. )

Through undersigned counsel, the above-captioned Plaintiffs complain and allege as follows, and where the term "Defendants" is used herein, "Defendants" is intended to and does mean and include each and every individual Defendant named in the caption above:

## **PARTIES**

1. Plaintiff Pacific Coast Auto Body is incorporated in and has its principal place of business in Moorpark, California.

2. Plaintiff D & M Auto Body is incorporated in and has its principal place of business in Albany or Berkeley, California.

3. Plaintiff Campbell's Auto Body is organized in and has its principal place of business in San Rafael, California.

4. Plaintiff Amato's Auto Body is incorporated in and has its principal place of business in San Diego, California.

5. Defendant State Farm Mutual Automobile Insurance Company ("**State Farm**") is registered with the California Department of Insurance to do business and is doing business within California, its corporate headquarters are located at One State Farm Plaza in Bloomington, Illinois, and it may be served with process through its registered designated agent in California, Dana Silver, at 3345 Michelson Drive, 4th Floor, in Irvine, California, 92612.

6. Defendant Interinsurance Exchange of the Automobile Club is registered with the California Department of Insurance to do business and is doing business within California, its corporate headquarters are located at 3333 Fairview Road in Costa Mesa, California, and it may be served with process through its registered designated agent in California, Gail Louis, at 3333 Fairview Road, A451, in Costa Mesa, California, 92626.

7. Defendant Allstate Indemnity Company is registered with the California Department of Insurance to do business and is doing business within California, its corporate headquarters are located at 3075 Sanders Road, Suite H1 A in Northbrook, Illinois, and it may be served through its registered designated agent in California, Nancy, Flores, c/o CT Corporation System, at 818 West Seventh Street in Los Angeles, California, 90017.

8. Defendant Mercury Insurance Company is registered with the California Department of Insurance to do business and is doing business within California, its corporate headquarters are located at 4484 Wilshire Blvd. in Los Angeles, California, and it may be served through its registered designated agent in California, Douglas Menges, at 555 West Imperial Highway in Brea, California, 92821.

9. Defendant CSAA Insurance Exchange is registered with the California Department of Insurance to do business and is doing business within California, its corporate headquarters are located at 3055 Oak Road in Walnut Creek, California, and it may be served through its registered designated agent in California, Nancy, Flores, c/o CT Corporation System, at 818 West Seventh Street in Los Angeles, California, 90017.

10. Defendant Farmers Insurance Exchange is registered with the California Department of Insurance to do business and is doing business within California, its corporate headquarters are located in Los Angeles, California, and it may be served through its registered designated agent in California, Doren Hohl, at 4680 Wilshire Boulevard, Los Angeles, California 90010.

11. Defendant Mid-Century Insurance Company is registered with the California Department of Insurance to do business and is doing business within

California, its corporate headquarters are located in Los Angeles, California, and it may be served through its registered designated agent in California, Doren Hohl, at 4680 Wilshire Boulevard, Los Angeles, California 90010.

12. Defendant GEICO General Insurance Company is registered with the California Department of Insurance to do business and is doing business within California, its corporate headquarters are located at One GEICO Plaza in Washington, DC, and it may be served through its registered designated agent in California, Nancy Flores, c/o CT Corporation System, at 818 West Seventh Street in Los Angeles, California, 90017.

13. Defendant Infinity Insurance Company is registered with the California Department of Insurance to do business and is doing business within California, its corporate headquarters are located at 3700 Colonnade Parkway, Suite 600, in Birmingham, Alabama, and it may be served through its registered designated agent in California, Nancy Flores, c/o CT Corporation System, at 818 West Seventh Street in Los Angeles, California, 90017.

14. Defendant 21st Century Insurance Company is registered with the California Department of Insurance to do business and is doing business within California, its headquarters are located at 3 Beaver Valley Road in

Wilmington, Delaware, and it may be served through its registered designated agent in California, Kashonda Lawson, c/o Corporation Service Company, 2710 Gateway Oaks Drive, Suite 150N, Sacramento, California, 95833.

15. Defendant California Automobile Insurance Company is registered with the California Department of Insurance to do business and is doing business within California, its corporate headquarters are located at 4484 Wilshire Blvd. in Los Angeles, California, and it may be served through its registered designated agent in California, Douglas Menges, at 555 West Imperial Highway in Brea, California, 92821.

16. Defendant USAA Casualty Insurance Company is registered with the California Department of Insurance to do business and is doing business within California, its corporate headquarters are located at the USAA Building, 9800 Fredericksburg Road, F3E, in San Antonio, Texas, and it may be served through its registered designated agent in California, Nancy Flores, c/o CT Corporation System, at 818 West Seventh Street in Los Angeles, California, 90017.

17. Defendant Safeco Insurance Company of America is registered with the California Department of Insurance to do business and is doing business

within California, its corporate headquarters are located at 175 Berkeley Street in Boston, Massachusetts, and it may be served through its registered designate agent in California, Kashonda Lawson, c/o Corporation Service Company, 2710 Gateway Oaks Drive, Suite 150N, Sacramento, California, 95833.

18. Defendant Liberty Mutual Fire Insurance Company is registered with the California Department of Insurance to do business and is doing business within California, its corporate headquarters are located at 175 Berkeley Street in Boston, Massachusetts, and it may be served through its registered designated agent in California, Kashonda Lawson, c/o Corporation Service Company, 2710 Gateway Oaks Drive, Suite 150N, Sacramento, California, 95833.

19. Defendant United Services Automobile Association is registered with the California Department of Insurance to do business and is doing business within California, its corporate headquarters are located at the USAA Building, 9800 Fredericksburg Road, F3E, in San Antonio, Texas, and it may be served through its registered designated agent in California, Nancy Flores, c/o CT Corporation System, at 818 West Seventh Street in Los Angeles, California, 90017.

20. Defendant Alliance United Insurance Company is registered with the California Department of Insurance to do business and is doing business within California, its corporate headquarters are located at 9121 Oakdale Avenue, Suite 201 in Chatsworth, California, 91311, and it may be served at that address through its registered designated agent in California, Eric Ellison.

21. Defendant Wawanesa General Insurance Company is registered with the California Department of Insurance to do business and is doing business within California, its corporate headquarters are located at 9050 Friars Road, Suite 200, in San Diego, California, 92108-5865, and it may be served at that address through its registered designated agent in California, David Fitzgibbons.

22. Defendant Coast National Insurance Company is registered with the California Department of Insurance to do business and is doing business within California, its corporate headquarters are located at 333 South Anita Drive in Orange, California, and it may be served through its registered designated agent in California, Kashonda Lawson, c/o Corporation Service Company, 2710 Gateway Oaks Drive, Suite 150N, Sacramento, California, 95833.

23. Defendant United Financial Casualty Company is registered with the California Department of Insurance to do business and is doing business within California, its corporate headquarters are located at 6300 Wilson Mills Road in Mayfield Village, Ohio, and it may be served through its registered designated agent in California, Nancy Flores, c/o CT Corporation System, at 818 West Seventh Street in Los Angeles, California, 90017.

24. Defendant Progressive West Insurance Company is registered with the California Department of Insurance to do business and is doing business within California, its corporate headquarters are located at 6300 Wilson Mills Road in Mayfield Village, Ohio, and it may be served through its registered designated agent in California, Nancy Flores, c/o CT Corporation System, at 818 West Seventh Street in Los Angeles, California, 90017.

25. Defendant American Family Home Insurance Company is registered with the California Department of Insurance to do business and is doing business within California, its corporate headquarters are located in Ohio, and it may be served through its registered designated agent in California, Sean Prewitt, c/o Registered Agent Solutions, Inc. at 1220 S Street, Suite 150 in Sacramento, California, 95811.

26. Defendant Amica Mutual Insurance Company is registered with the California Department of Insurance to do business and is doing business within California, its corporate headquarters are located in Rhode Island, and it may be served through its registered designated agent in California, Jeffrey Teece, 1650 Corporate Circle, Suite 110, in Petaluma, California, 94954.

## JURISDICTION AND VENUE

27. This Court has original jurisdiction over the Sherman Act claims stated herein below pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1391(b)(2).

28. A substantial part of the events, acts and omissions giving rise to said claims occurred in this United States Judicial District.

## FACTS

29. Each Plaintiff is in the business of repair of motor vehicles that have been involved and damaged in a collision.

30. Each Defendant is an insurer providing automobile policies to consumers throughout California.

31. Each Plaintiff has done business at various times over the course of years with the Defendants' policyholders and claimants by providing them motor vehicle collision repair service.

32. Each Defendant is responsible for payment for those repairs for their respective policyholders and claimants.

33. Over the course of several years, the Defendants have engaged in an ongoing, concerted and intentional course of action and conduct, with State Farm acting as the spearhead, to improperly and illegally control and depress automobile damage repair costs to the detriment of the Plaintiffs and the substantial profit of the Defendants.

34. One of the methods by which the Defendants exert control over Plaintiffs' businesses is by way of entering program agreements with body shops like the Plaintiffs.  Although each Defendant's program agreements have unique titles, such agreements are known generally and generically within the collision repair industry as direct repair program agreements (sometimes hereinafter referred to as "***DRPs***")."

35. DRP's were presented to body shops as a mutually beneficial opportunity: in exchange for providing certain concessions of price, priority and similar

matters, the individual Defendants would list the body shop as a preferred provider.

36. However, the concessions demanded by the individual Defendants in exchange for remaining on the direct repair program were not balanced by the purported benefits.

37. The Defendants, particularly State Farm, have utilized these program agreements to exert control over the Plaintiffs' businesses in a variety of ways, well beyond that of an ordinary business agreement and even whether or not Plaintiffs are a DRP shop for any Defendant herein.

38. Defendants, particularly State Farm, have engaged in an ongoing pattern and practice of coercion and implied threats to the pecuniary health of the Plaintiffs' businesses in order to force compliance with unreasonable and onerous concessions whether or not Plaintiffs are a DRP shop for any Defendant herein.

39. Failure to comply with the forced concessions results in removal from the program agreement(s) (if a shop was a DRP shop) combined with improper "steering" of customers away from the Plaintiffs' businesses to decrease the number of customers utilizing the Plaintiffs' services.

40. According to the California Department of Insurance, in its 2013 Company Market Share Report, State Farm had captured about 13.5% of the private passenger automobile insurance business in the state; its next closest competitor, Defendant Interinsurance Exchange of the Automobile Club, had 8.18%, and State Farm's next closest competitor, Defendant Allstate Indemnity Company, had 6.72%. See attached hereto as Exhibit A, a true and correct copy of the 2013 California Department of Insurance Private Passenger Automobile Insurance Company Market Share Report.

41. Overall, Defendants controlled about 74.81% or almost 3/4 of the total 2013 private passenger automobile insurance market in California. Id.

42. Of the remaining 144 insurance companies reporting earned premiums in the California market for private passenger automobile insurance in 2013, the average share for each was approximately 0.16%. Id.

43. Based upon these the most recent available statistics, State Farm thus holds the unchallenged dominant position within the automobile insurance industry in the California market. Id.

44. The vast majority of the Plaintiffs' business is generated by customers for whom the Defendants are responsible to pay repair costs; the insurance-paying customers account for between about seventy and ninety-five percent

of each shop's revenue; and sister federal courts to this Court acknowledge the significant role insurance companies play in funding automobile collision repairs and their concomitant ability and market power to exert substantial influence and control over where consumers will take a wrecked car for repair.  See, e.g., *Allstate Ins. Co. v. Abbott*, 2006 U.S. Dist. LEXIS 9342 (N.D. Tex. 2006) (aff'd, *Allstate Ins. Co. v. Abbott*, 495 F.3d 151 (5th Cir. 2007).

45. Each DRP contains a general statement and proposition that the body shop is to charge the respective insurance company no more for any particular repair than is the going rate in the market area.

46. State Farm systematically and improperly establishes the "market rate" through what it calls "surveys."

47. The geographical boundaries of the market area "surveyed" to establish the "market rate" are wholly within the control and direction of State Farm.

48. Under the terms of its DRP, State Farm is not required to disclose any of the methods by which it establishes the market area, the market rate or any other factual bases for its determination of the "market rate"; the program agreement contains no provisions for independent and neutral verification of the data utilized or any oversight not directly within the control and direction

of State Farm; body shops are simply required to blindly accept State Farm's pronouncements regarding these matters.

49. Previously State Farm conducted this "survey" by sending written material to body shops of which a representative would complete and return it to State Farm; more recently State Farm has developed and employs a 'business to business' web-based portal whereby body shops complete and submit the "survey" online.

50. State Farm does not perform a survey in the traditional sense where information is obtained and results produced that establish an actual baseline of all the shops' information.

51. With respect to labor rates as an example, State Farm's methodology does not represent what the majority of shops in a given area charge but quite the contrary; State Farm's methodology lists the shops in a given market (as determined by State Farm) with the highest rates submitted at the top of the list and descending to the least expensive hourly rates at the bottom.

52. State Farm then lists how many technicians a shop employs or the number of work bays available, whichever is lesser; those are then totaled and State Farm employs a "half plus one" method; if, for example, a State-Farm-determined market area has a total of fifty (50) technicians or work bays,

State Farm's "half plus one" math equals twenty six (26); with that number, starting at the bottom of the shop list, State Farm counts each shops technicians until the "half plus one" number is reached, twenty six in this example, and whatever that shop's rate happens to be is declared the market rate.

53. There could, arguably, be some validity to this method if it accounted for the variance in shop size, skill of technicians and other quality variables, but it does not; the greater problem with this method however is that State Farm can and does alter the labor rates inputted by the shops, thereby decreasing those rates arbitrarily deemed too high by State Farm and higher than State Farm wishes to pay.

54. By altering the rates entered, particularly those of the larger shops, those with the most technicians and/or work bays, State Farm manipulates the results to achieve a wholly artificial "market rate"; the results are therefore not that of an actual survey reflecting the designated market area but created from whole cloth by State Farm.

55. Furthermore, State Farm attempts to prohibit the shops from discussing with each other the information each has entered into the survey, or their respective rates in general—whether or not shops are participating in State

Farm's program—asserting that any discussion may constitute illegal price fixing.  State Farm selects the geographical boundaries of the "survey" and retains the right to alter the "survey" results (and State Farm does so) all without disclosure or oversight.  State Farm does not publish or otherwise make available publicly its self-determined "market" and "market rate."

56. Another electronic page on State Farm's business portal is known as the Dashboard/Scorecard.  <u>See</u> attached hereto as Exhibit B and for illustration a true and correct copy of State Farm's Dashboard for a certain body shop.

57. The Dashboard has substantive impact on several levels; it serves as the record of an individual shop's survey responses and also provides a "report card" and rating of the individual shop based primarily upon three criteria--quality, efficiency and competitiveness.

58. Within the quality criterion, the shop's reported customer satisfaction, customer complaints and quality issues identified by an audit are scored.

59. The efficiency criterion evaluates repair cycle time—the number of days a vehicle is in the shop as determined by a cars' drop-off and pickup dates.

60. The competitiveness criterion analyzes the average estimate for each State Farm repair, the cost of parts, whether a vehicle is repaired or replacement parts are utilized and the number of hours to complete a repair and similar

matters.  <u>See</u> page 2 of Exhibit B, a true and correct copy of a State Farm Score or Report Card.

61. In rating a shop, 1000 total points are possible, but State Farm claims it is under no obligation to disclose the weight or total number of points allocated to each factor in reaching a shop's "score," particularly those factors included under the competitiveness criterion; and State Farm has refused to disclose its method of determining competitiveness even to its own team leaders.

62. Due to this opacity, State Farm maintains complete and unsupervised authority to determine an individual shop's rating, and it is therefore possible for a shop to have no customer complaints, high customer satisfaction, no issues identified on an audit and complete compliance with all repair cycle time and efficiency requirements, and yet still have a low rating; it is also possible for a shop to have multiple customer complaints, poor customer satisfaction, numerous issues identified on audit and complete failure to meet efficiency expectations, and yet have a very high rating.

63. A body shop's Dashboard and Report Card rating determines its position on the preferred provider list; so, when a claimant logs on to the State Farm web site seeking an auto body repair shop, shops with the highest ratings are

displayed first whereas ones with low ratings will be at the bottom of the list—often pages and pages down—making it difficult and less likely for a potential customer to find a shop rated arbitrarily low by State Farm and its criteria.

64. Additionally, if a customer calls State Farm, State Farm's practice and/or procedure is for its representative to identify and recommend preferred shops holding the highest Dashboard/Report Card rating.

## **Suppression of Labor Rates**

65. Among the questions asked by the "survey" is the individual shop's hourly labor rate. This information is supposed to be provided by the shop and to accurately reflect that shop's labor rate to allow State Farm to reach a "market rate."  The actual method by which State Farm determines "market rate" however is described above.

66. If the labor rate information received is unilaterally deemed unacceptable by State Farm, a State Farm representative will contact the shop and demand the labor rate be lowered to an amount State Farm wishes to pay.

67. If the body shop advises its labor rates are higher or will be increasing or that an increase is required, a State Farm representative will inform the body shop it is the only shop in the area that has raised or is raising its rates, and

therefore the higher rate does not conform to the "market rate" and is thus a violation of the direct repair program agreement.

68. At various points in time, State Farm has utilized this method of depressing labor rates, telling each shop it is the only one to demand a higher labor rate when, in fact, multiple shops have attempted to raise their labor rates and advised State Farm of such.

69. Should a shop persist in its efforts to raise its labor rate, State Farm will take one or more of several "corrective" measures: it will go into the individual shop's survey responses and alter the labor rate listed without the knowledge or consent of the shop and use this lowered rate to justify its determination of the "market rate"; it will threaten to remove the shop from the direct repair program to coerce compliance; and/or it will remove the shop from the direct repair program.

70. The net effect of this tactic is to allow State Farm to manipulate the "market rate" and artificially suppress the labor rate and control shops for the relevant geographic area, an area which, again, is defined solely by State Farm and is not subject to either neutral verification or even disclosure.

71. The other Defendants intentionally and by agreement and/or conscious parallel behavior have specifically advised the Plaintiffs they will pay no

more than State Farm pays for labor. These Defendants have not conducted any surveys of their own in which the Plaintiffs have participated to determine market rates and Defendants have agreed to join forces with State Farm, the dominant market holder, and with each other to coerce the Plaintiffs into accepting the artificially created less-than-market labor rates through intimidation and threats to the Plaintiffs' financial ability to remain operating.

## **Suppression of Repair and Material Costs**

72. Through various methods, the Defendants have, independently and in concert, instituted numerous methods of coercing the Plaintiffs into accepting less than actual and/or market costs for materials and supplies expended in completing repairs.

73. Some of these methods include but are not limited to: refusal to compensate the shops for replacement parts when repair is possible though strongly not recommended based upon the shop's professional opinion; utilizing used and/or recycled parts rather than new parts, even when new parts are available and a new part would be the best and highest quality repair to the vehicle; requiring discounts and/or concessions be provided, even when doing so requires the shop to operate at a loss; and de facto compulsory utilization of parts procurement programs.

74. Defendants have also intentionally and repeatedly failed to abide by auto repair industry standards as set forth below.

75. Three leading motor vehicle collision repair estimating databases are in ordinary usage within the auto body collision repair industry: (a) ADP; (b) CCC; and (c) Mitchell.

76. These databases provide software and average costs associated with particularized types of repairs to create estimates.  The estimates generated by these databases include the ordinary and customary repairs, repair time (labor) and materials necessary to return a vehicle to its pre-accident condition.  These databases and the estimates they generate are accepted within the industry as reliable starting points, subject to the shop's expert opinions and the necessarily present variability between the "best-case scenario"[1] presented by the procedure databases and the actual needs of a particular repair.

---

[1] The database procedure pages set forth the anticipated repairs, repair times and materials for repair of an undamaged vehicle using original manufacturer equipment which are specifically designed to fit that particular vehicle.  Wrecked cars are obviously not undamaged and original manufacturer parts are not always used, particularly with repairs for which State Farm and the other Defendants are

77. Over the course of years, the Defendants have admitted the accepted position of the estimating databases within the industry but have nonetheless engaged in a course of conduct of refusing to make full payment for procedures and materials.  In many instances the Defendants will even refuse to allow the body shop to perform required procedures and processes, thereby requiring the Plaintiffs to perform less-than-quality work or suffer a financial loss.

78. A true and correct copy of a non-exhaustive list of procedures and processes for which the Defendants refuse to pay and/or pay in full is attached hereto as Exhibit C.

79. At the same time, Defendants selectively rely upon and assert the definitive nature of these databases when doing so is to their respective financial advantage.  For example, when a particular repair requires twenty hours of labor to complete but the database estimate notes fifteen hours of labor is standard for that type of repair, Defendants will cite the database estimate and pay for only fifteen hours of labor time.

responsible for payment, which can substantially affect repair procedures required, repair times and necessary materials.

80. With respect to materials, while it is inarguable that materials must be expended to repair automobile collisions, Defendants simply refuse to pay for them, asserting materials are part of the cost of doing business.  This is Defendants' position even when the authoritative databases specifically state that such materials are <u>not</u> included in the repair procedure pages.

81. The only partial exception to this practice is paint.  While paint costs are factored into the amount the Defendants will pay, it is calculated via a formula which compensates the shops for only half the actual cost on average.  The Defendants' method of calculating paint payment does not take into account the type of paint needed/used, the requirement that paint be mixed to match the existing color of the vehicle, the actual amount of paint required to complete the job, the type of vehicle involved or any other factor. Defendants pay only based upon arbitrary caps that are self-established and unrelated to actual costs to the Plaintiffs.

82. This continued refusal and/or failure to compensate Plaintiffs for ordinary and customary repairs and materials costs places Plaintiffs in the untenable position of either performing incomplete and/or substandard repairs and thus breaching their obligation to automobile owners to return vehicles to pre-accident condition, or performing labor and expending materials without

proper compensation and thereby jeopardizing continuing viability of the business enterprise.

83. As illustration: the foregoing concerns prompted a meeting between many body shops involved in an action originally filed in the United States District Court, Southern District of Mississippi, styled as *Capitol Body Shop, Inc. et al v. State Farm Mut. Auto Ins. Co.,* Cause No. 3:14-cv-12 [4] ; there, the body shops' representatives met with Tim Bartlett, State Farm Estimatix team leader, John Findley, Estimatix section manager, Steve Simkins, State Farm counsel for Mississippi and Alabama and members of the Mississippi Department of Insurance in April 2013; at the meeting the members of the automobile collision repair industry expressed their dissatisfaction and concerns with the very practice of refusing to compensate fully and fairly for repairs that were performed and State Farm's inconsistent application of the database estimating software, *viz.*, utilizing database estimates only when it is in State Farm's financial best interest to do so.

84. State Farm representative Tim Bartlett acknowledged (before witnesses) that repairs and subsequent payment for those repairs should be consistent with

---

[4]     The action has been transferred to the Middle District of Florida, Orlando Division, as part of Multidistrict Litigation No. 2557.

the estimates prepared through the database software. Mr. Bartlett assured those present including the Department of Insurance representative that it (State Farm) would begin abiding by those database estimates and stated it would raise the matter at its insurance industry meetings held locally approximately once a month.

85. Also at that meeting, Mr. Simpkins asked if insurance representatives might be permitted to attend the meetings of the Mississippi Automobile Collision Society. The association representative present for the meeting, John Mosley, invited State Farm to attend those Association meetings if State Farm would permit members of the Association to attend the insurance meetings; a reciprocal request that Mr. Simkins refused.

86. Despite the assurances given the body shop representatives and the Department of Insurance at this meeting, State Farm failed to perform as promised in Mississippi.  The same state of affairs persists in California. State Farm and the other Defendants in collusion with State Farm continue to refuse to make payment and/or full payment for necessary and proper repairs, labor and materials.

87. State Farm also imposes restrictions upon the Plaintiffs' ability to obtain and utilize quality replacement parts and materials.   As part of its DRP

agreement, State Farm asserts it has the unilateral authority to enter into separate agreements with manufacturers, distributors or suppliers of automotive parts, supplies or materials.

88. Despite the fact that the shops have no involvement in the negotiation of those separate agreements, they are de facto required to abide by the pricing agreements reached, even if they do not make purchases with those vendors. Although presented as an option to participate, the optional language is rendered nugatory by additional language which requires the shops to accept as payment only that amount for which the parts and/or materials could have been obtained through those agreements. Participation or lack thereof is therefore completely meaningless and the optional language is illusory.

89. The Defendants enforce these limitations and/or requirements across the board, including against shops like one or more of the Plaintiffs which may not have been DRP shops within the time relevant to this action.

90. Further, shops are required to "stack" this purportedly optional usage of separate agreements with other discounts required elsewhere within the agreement. Thus, the limitation on payment, refusal to compensate for nearly all materials and the compelled discounts end in a shop operating at or near a loss for each repair, even those shops like one or more of the

Plaintiffs which may not have been DRP shops within the time relevant to this action.

91. Though the foregoing conduct is led by State Farm as the dominant market share holder, all Defendants have agreed to and/or consciously parallel the compensation ceilings established by State Farm and do so solely to increase their profits but to the substantial detriment of the Plaintiffs and consumers.

### **Steering**

92. The Defendants also regularly and routinely "steer" their policyholders away from auto body shops perceived as not complying with an aspect of their program agreement and towards shops they favor and perceive as compliant with them, causing substantial harm to Plaintiffs' business reputation and operations.  California law prohibits automobile insurance companies from requiring consumers to use particular body shops to effect repairs; and to avoid facially violating this law, Defendants "steer" insureds and/or claimants to favored compliant shops through misrepresentation, insinuation and casting of aspersion upon the business integrity and quality of shops the Defendants disfavor.

93. Examples of steering include advising insureds and/or claimants that a particular chosen shop is not on the preferred provider list, advising that

quality issues have arisen with that particular shop, that complaints have been received about that particular shop from other consumers, that the shop charges more than any other shop in the area and these additional costs will have to be paid by the consumer, that repairs at the disfavored shop will take much longer than at other preferred shops and the consumer will be responsible for rental car fees beyond a certain date, and that the Defendant cannot guarantee the work of that shop as it can at other shops.

94. These statements have been made about Plaintiffs without any attempt to ascertain the truth thereof, and some of the ills recited, which implicitly criticize the shops, are wholly attributable to the insurer itself.  For instance, the statement that repairs will take longer at a disfavored shop–consumers are not told that the delay in beginning repairs is due to the insurer's decision to delay sending an appraiser to evaluate the damage, a decision completely and wholly within the control of the Defendants.  Asserting shops charge more is often not a function of what the shop actually charges but the Defendants' refusal to pay, also a factor wholly and completely within the control of the respective Defendant.  Yet both are conveyed to the public as problems with the shop rather than the effect if the Defendants' own decisions.

95. The most egregious of these statements, that the Defendant cannot guarantee the work of the shop, is particularly misleading as *none* of the Defendants offer a guarantee for repair work. Instead, the Defendants require the body shops to provide a limited lifetime guarantee on work performed.  In the event additional work is required, the body shop is required to do so without any additional payment or to indemnify the insurer for costs if work is performed at another shop.

96. Thus, while it may be a facially truthful statement that an insurer cannot guarantee the work of a particular shop, the clearly understood inference is that it can and will guarantee the work of another, favored shop, which is simply not so.

### Intentional Nature of Defendants' Conduct

97. In 1963, a Consent Decree was entered in *United States vs. Association of Casualty and Surety Companies*, et al, Docket No. 3106, upon a complaint filed in the United States Southern District of New York wherein the allegations included violations of Sections 1 and 3 of the Sherman (Antitrust) Act.  A true and correct copy of this Decree is attached hereto as Exhibit D.

98. Specific wrongful conduct actions supporting the allegations included: (1) requiring repair rather than replacement of damaged parts; (2) replacing damaged parts with used rather than new parts; (3) obtaining discounts on new replacement parts; (4) establishing strict labor time allowances; (5) suppressing the hourly labor rate; (6) and channeling auto repairs to those repair shops which would abide by the insurer estimates and boycotting those which refused.  The Complaint alleged further a conspiracy and combination in unreasonable restraint of trade and commerce for these practices.

99. The Consent Decree ordered and provided for the following relief and enjoined the defendants therein from: (1) placing into effect any plan, program or practice which has the purpose or effect of (a) directing, advising or otherwise suggesting that any person or firm do business or refuse to do business with any independent or dealer franchised automotive repair shop with respect to the repair of damage to automobile vehicles; (2) exercising any control over the activities of any appraiser of damages to automotive vehicles; (3) fixing, establishing, maintaining or otherwise controlling the prices to be charged by independent or dealer franchised automotive repair shops for the repair of damage to automotive vehicles or for replacement

parts or labor in connection therewith, whether by coercion, boycott or intimidation or by the use of flat rate or parts manuals or otherwise.

100.     Whether or not any current Defendant is legally bound by this Decree, the actions described in the present cause fall squarely within those prohibited by the Decree.  The Decree has been "on the books" for fifty years and is well-known within the insurance industry.

101.     The Consent Decree being known to the Defendants, it can only be said that Defendants were fully aware their actions, plans, programs, and combinations and/or conspiracy to effectuate the same have been willful, intentional and conducted with complete and reckless disregard for the rights of the Plaintiffs.

## CLAIMS FOR RELIEF

### COUNT ONE:
### QUANTUM MERUIT: CONTRACT IMPLIED IN LAW, QUASI-CONTRACT AND UNJUST ENRICHMENT

102.     Quantum meruit rests in part upon the equitable legal principle that a party is not permitted to enrich itself at the expense of another and that a legally enforceable promise in the nature of a contractual one is implied in and by law that Defendants must compensate Plaintiffs for the value of the labor and materials furnished by their collision repair services.

103.    Defendants have requested, whether explicitly or implicitly, that Plaintiffs perform collision repair services for them and their insured policyholders/claimants; Plaintiffs have conferred legally cognizable benefits upon the Defendants by expending material resources and performing valuable collision repair services for Defendants and their insured policyholders/claimants' vehicles to properly repair the insured vehicles; and Defendants are required as the insurers to pay completely for all aspects of those collision repair services.

104.    Plaintiffs' valuable collision repair services were intended to benefit and did benefit the Defendants and their insureds.

105.    Plaintiffs conferred these benefits upon Defendants and their insureds with a reasonable expectation of full compensation for the value of all aspects of the collision repair services performed.

106.    Defendants appreciate and know of the benefits that Plaintiffs have conferred upon them and their insureds' vehicles, but Defendants unjustly and inequitably compensate Plaintiffs if and how Defendants' choose rather than commensurate with the actual value of the benefits.

107.    Defendants have accepted and retained the benefits conferred upon them and their insureds with full appreciation of the facts and circumstances

making it inequitable for the Defendants not to fully compensate the Plaintiffs for the value of all the aspects of the collision repair services they've performed.

108.    Defendants thereby actually retain for themselves substantial measures of the value of the benefits conferred and enrich themselves unjustly at the expense of the Plaintiffs under circumstances making it inequitable for them to do so.

109.    Under the circumstances of this action, the value of the benefits which Defendants are retaining unjustly and inequitably is the monetary cost of all the services, which the Plaintiffs furnish and expend in repairing the Defendants' policyholders/claimants' vehicles back on the road in pre-accident condition, and for which monetary cost the Defendants are required to pay on behalf of their insureds.

110.    Plaintiffs are equitably entitled to recover all the value of the benefits they confer upon Defendants, to wit, complete payment for and compensation of the labor furnished and materials the Plaintiffs expend in the necessary proper collision repair services performed for Defendants and their policyholders' vehicles.

### COUNT TWO:

## <u>INTENTIONAL INTERFERENCE WITH</u>
## <u>PROSPECTIVE ECONOMIC ADVANTAGE</u>

111.     Defendants intentionally interfere with the Plaintiffs' prospective and/or existing economic relations and advantage by steering large amounts of business away from them as alleged above.

112.     There exists an economic relationship between the Plaintiffs and the Defendants' claimants and/or policyholders with the probability of future economic benefit to the Plaintiffs arising from the business and service to be done for the claimants and/or policyholders.

113.     Defendants are manifestly aware of this economic relationship between Plaintiffs and their claimants and/or policyholders in part and not least because they know the latter need their vehicles repaired to pre-accident condition.

114.     When Defendants steer claimants and policyholders intentionally toward auto body shops not because they do the best quality work or provide the best value but rather to improperly reward those shops for submission and silence about Defendants' economic aggrandizement of themselves at the expense of the collision repair industry, the Defendants do so with a design substantially certain to and that does in fact disrupt the economic

relationship between the Plaintiffs and the claimants and policyholders whom they (the Defendants) have steered.

115.    Defendants' steering activities of for example providing deceptive information about the Plaintiffs' reputation, quality of work, efficiency and reliability are independently wrongful, apart from their purely improper motives and purposes, as they are proscribed by statutory and regulatory laws of California.

116.    Defendants' steering activities punish the Plaintiffs and economically beat them into submission (and seek to beat the entire collision repair industry into submission); this economic harm of lost business is caused to Plaintiffs for their complaining about the Defendants' manipulation and setting of artificial and oppressive market labor rates, for their refusing to kowtow and rather charge fair and actual market labor rates and/or for their complaining about Defendants' selective application of the estimate databases, setting of arbitrary price ceilings and refusals to compensate the actual and entire labor and materials repair costs.

117.    Defendants' interference injures the Plaintiffs by improperly decreasing the volume of their business operations and damaging their business reputations amongst consumers.

## COUNT THREE: CONVERSION

118.    Conversion requires one's wrongful disposition of another's right to possession of property and resulting damage. The wrong lies in the interference with the owner's right to do as he/she/it will with it. Whoever does this in any manner subversive of the owner's right to enjoy or control what is his/her/its own, is liable for conversion whether the property right is tangible or intangible.

119.    Plaintiffs have performed reasonable and necessary quality work and expended appropriate labor and materials to do it for which Defendants are required to but refuse to pay or pay in full even after demand is made and thereby retain and convert Plaintiffs' monies as if it belonged to them and thereby further exercise wrongful disposition over the Plaintiffs' business rights in estimation, profits, procedures and general operations.

120.    Defendants' action constitutes wrongful assumption of control and assumption of ownership of Plaintiff's property and their business: not only the monetary value of their work but also the fruits of their labor.

121.    Defendants do not perform the work and are not in the business of determining what a reasonable and necessary quality repair entails or costs; nevertheless they retain rather than give to Plaintiffs the money that accounts

for the reasonable and necessary quality repair performed and also take from Plaintiffs their right to their business.

122.    Defendants' action constitutes wrongful disposition and possession not only of specific and identifiable sums of Plaintiffs' money and profits but also all the intangible property rights that flow with the money to the Plaintiffs that make up their business, which at a minimum causes damage in the amount of the reasonable and necessary costs of the labor spent and materials used to repair and restore to pre-accident condition the vehicles belonging to Defendants' policyholders/claimants.

**COUNT FOUR: UNFAIR BUSINESS PRACTICES: CALIFORNIA BUSINESS AND PROFESSIONS CODE SECTIONS 17200 et seq.**

123.    Defendants' acts and/or practices associated with DRP's, "surveys," suppression of labor rates, suppression or repair and material costs, steering and making an end-run around the 1963 Consent Decree alleged above all further constitute violations of California's Unfair Business Practices Act, and they harm not only body shops including the Plaintiffs but also consumer insureds and drivers whom likely have been and continue to be deceived accordingly by Defendants.

124.    Defendants' acts and/or practices are unlawful and unfair and undoubtedly tethered to underlying state statutory and regulatory provisions

and not only threaten incipient violations of but in fact do violate the policy, spirit and letter of certain federal antitrust laws.

## COUNT FIVE: VIOLATIONS OF THE SHERMAN ACT– PRICE-FIXING

125.     Pursuant to 15 U.S.C. §1, the Sherman Act prohibits contracts, combinations or conspiracies in restraint of trade, and such agreements are illegal if (1) their purpose or effect is to create an unreasonable restraint of trade, or (2) they constitute a per se violation of the statute.

126.     Through parallel actions and/or explicit agreement, the Defendants have formed and engaged in a vertical conspiracy or combination to impose maximum price limits upon the Plaintiffs for their products and services.

127.     The United States Supreme Court has noted that agreements to fix maximum prices, no less than those to fix minimum prices, cripple the freedom of traders and thereby restrain their ability to sell in accordance with their own judgment. *Kiefer-Stewart Co. vs.  Joseph E. Seagram and Sons, Inc.*, 340 U.S. 211 (1951).

128.     The Defendants and co–conspirators have engaged in combination and conspiracy in unreasonable restraint of trade and commerce in the motor vehicle collision repair industry.

129.     The Defendants and co–conspirators have engaged in combination and conspiracy in unreasonable restraint of trade and commerce in the motor vehicle collision repair industry.

130.     The aforesaid combination and/or conspiracy has consisted of a continuing agreement in concert of action among the Defendants and co-conspirators to control and suppress automobile damage repair costs, automobile material repair costs through coercion and intimidation of the Plaintiffs.

131.     Evidence of this conspiracy or combination include, but is not limited to, admission before witnesses that members of the insurance industry meet regularly to discuss such matters in and amongst themselves but refuse to allow members of the collision repair industry to attend those meetings, explicit statements by Defendants that they will conform to State Farm's unilaterally imposed payment structure, admitting the baseline application of the industry databases but failing to conform to that minimum standard, followed by the uniformity of action by all Defendants.

132.     The aforesaid offenses have had, among others, the effect of eliminating competition within the motor vehicle collision repair industry, elimination of some auto body shops from a substantial segment of the

business in the industry for refusing or attempting to refuse the Defendants' arbitrary price ceilings, and subjecting shops to collective control and supervision of prices by the Defendants and co-conspirators.

133.   Neither the Plaintiffs nor other members of the collision repair industry are able to engage in competitive business practices since the Defendants have effectively and explicitly determined what their business practices will be.

134.   The Defendants actions individually and certainly collectively have violated federal law and directly caused the Plaintiffs to incur substantial damages. Defendants are continuing and will continue said offenses unless the relief herein prayed for is granted.

## **COUNT SIX: VIOLATION OF THE SHERMAN ACT– BOYCOTT**

135.   The United States Supreme Court has repeatedly held that boycotts constitute a violation of the Sherman Act, 15 U. S. C. §1. "Boycott" has been defined within the antitrust law context as "pressuring a party with whom one has a dispute by withholding, or enlisting others to withhold, patronage or services from the target." *St. Paul Fire & Marine Ins. Co. v. Barry*, 438 U.S. 531, 541 (1978).

136.    The Defendants have engaged, and continue to engage, in boycott and boycotting activity through their repeated actions of steering customers away from the Plaintiffs through allegations and intimations of poor quality work, of poor efficiency in performing work, of questionable business practices, of overcharging, impugning integrity, and similar actions so as to withhold and\or enlist others to withhold patronage from the Plaintiffs.

137.    This boycott was specifically designed to pressure, intimidate, and/ or coerce the Plaintiffs into complying with the maximum-price limitations unilaterally conceived by Defendant State Farm and agreed to collusively by the other Defendants.

138.    It is irrelevant for purposes of the Sherman antitrust boycott activity that the Plaintiffs and Defendants are not direct competitors within the same industry. The United States Supreme Court has directly addressed this issue in *St. Paul Fire and Marine Insurance Company*, supra, stating, "[B]oycotters and the ultimate target need not be in a competitive relationship with each other." 438 U.S. at 543.

139.    Enlistment of third parties as a means of compelling capitulation by the boycotted group has long been viewed as conduct supporting a finding of unlawful boycott. *Id.*

140.    In the present matter, the Defendants have engaged in not only a boycott, but have regularly, routinely and purposefully enlisted the aid of unwitting third parties in carrying out their boycott through their intentional acts of steering those customers away from the Plaintiffs.

141.    Defendants' boycott was created and carried out with the sole purpose and intent of financially coercing and threatening the Plaintiffs into complying with the Defendants price caps.

142.    Defendants' actions are violation of federal law and have directly caused the Plaintiffs to incur substantial damages. Defendants are continuing and will continue said offenses unless the relief requested herein is granted.

## **PRAYER FOR RELIEF**

As a result of the Defendants' actions, Plaintiffs have been substantially harmed and will continue to suffer unless the relief requested herein is granted; the Plaintiffs therefore pray for the following relief:

A.    Compensatory damages for or restitution of the value of all non-payment and underpayment for work completed on behalf of the Defendants' insureds and claimants as determined by a jury.

B.    Compensation for the lost revenue through artificial suppression of labor rates as determined by a jury.

C.    Damages sufficient to compensate Plaintiffs for lost business opportunities as determined by a jury.

D.   Treble damages, reasonable attorneys' fees and costs  for violations of the Sherman Act, as required under 15 U.S.C. § 15.

E.   Injunctive relief prohibiting the Defendants from further engaging in any of the following:

    (1)   Placing into effect any plan, program or practice which has the purpose or effect of:

        (a)   directing, advising or otherwise suggesting that any person or firm do business or refuse to do business with any Plaintiff automotive repair shop with respect to the repair of damage to automobiles.

        (b)   fixing, establishing or otherwise controlling the prices to be charged by independent or dealer franchised automotive repair shops for the repair of damage to automobiles or for replacement parts or labor in connection therewith whether by coercion, boycott or intimidation, or by the use of flat rate or parts manuals or otherwise.

    (2)   Placing into effect any plan, program or practice which explicitly requires or has the purpose or effect of requiring Plaintiffs to participate in any parts procurement program.

    (3)   Providing untruthful and/or unverified information to customers or third persons regarding the quality, cost, efficiency or reputation of any Plaintiff ("steering").

    (4)   Prohibiting Defendant State Farm from altering or amending any Plaintiff response to its market labor rate "survey" without the express written permission of the affected Plaintiff.

F.   Punitive and/or exemplary damages sufficient to punish Defendants for their intentional acts and to deter each Defendant and similar entities from pursuing this illegal and improper conduct in the future.

G.      Pre- and post-judgment interest.

H.      Any additional relief the Court deems just and appropriate.

## **<u>CONCLUSION</u>**

WHEREFORE, Plaintiffs demand a judgment against Defendants in an amount sufficient to fully compensate Plaintiffs for damages incurred and/or restitution of the value of benefits lost to them as a result of Defendants' conduct with appropriate pre- and post-judgment interest, equitable relief as set forth above, punitive damages, attorneys' fees, expenses, costs and any other relief to which the Court deems the Plaintiffs are entitled.

Respectfully submitted this _7_th day of November, 2014

BY:    ___/s/ Mark L. Shurtleff_____

SHURTLEFF LAW FIRM
Mark L. Shurtleff